# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**CRIMINAL COMPLAINT**

EUREKA D. HOPSON
4642 N. 46th Street
Milwaukee, WI,

CASE NUMBER: 09-m-217

      Defendant.

    I, Jacqueline Sutton, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief: On or about January 28, 2009, in the State and Eastern District of Wisconsin, **EUREKA D. HOPSON,** the defendant herein, did conspire to possess and attempt to possess cocaine (a Schedule II controlled substance) with intent to distribute, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and conspire to obstruct and attempt to obstruct commerce by robbery, in violation of Title 18, United States Code, Section 1951(a).

    I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, and that this complaint is based on the following facts: Please see the attached affidavit which is continued on the attached sheet and made a part hereof:     X Yes     No

 

Signature of Complainant
Jacqueline Sutton
Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me and subscribed in my presence,

January 30, 2009
Date

at Milwaukee, Wisconsin
City and State

The Honorable Patricia J. Gorence
United States Magistrate Judge
**Name & Title of Judicial Officer**

Signature of Judicial Officer

## AFFIDAVIT

Jacqueline Sutton, being first duly sworn on oath, hereby deposes and says:

1. I am a Special Agent with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives. I am presently assigned to the Milwaukee, Wisconsin office.

2. I make this affidavit in support of a criminal complaint against Eureka D. Hopson, a black male with a date of birth of March 9, 1978.

3. I am the case agent for an ATF investigation of Hopson and I make this affidavit on the basis of information I have personally observed during the investigation as well as information I have obtained from other law enforcement officers or governmental sources during the investigation.

4. I have obtained information from the National Crime Information Center (NCIC) regarding Hopson's prior criminal record. It includes convictions for first degree recklessly endangering safety and possession of cocaine with intent to distribute for which Hopson was sentenced to six years in prison in 1996. It also includes a conviction in 1999 for being a felon in possession of a firearm for which Hopson received a four year sentence.

5. An undercover ATF agent (hereinafter UC), posing as a cocaine dealer, had a series of meetings with Hopson during January of 2009. Those meetings are described below. At each meeting, UC wore a recording and transmitting device which recorded the audio of the conversation and transmitted that audio to other law enforcement officers who were providing surveillance in the area of the meeting. My descriptions in this

affidavit of what was said in these meetings comes from a review of the audio recordings by me and UC.

6. On January 20, 2009, UC met with Hopson at Midwest Customs, located at 3345 North Booth in Milwaukee. UC stated that he bought kilograms of cocaine in Milwaukee to be resold in Rochester, New York. Hopson said that he could rob or kill drug dealers in Rochester for their drugs. Hopson bragged of past robberies of drug dealers. UC said that he had a suggested victim for one of these robberies in Milwaukee who had "keys." Hopson asked when UC wanted to do it and said that he had all of the tools, including ATF uniforms and other ATF gear which he and his crew used to facilitate the robberies. Hopson said, "I do this." UC said that his source of cocaine was overcharging him and was known to have 10 to 15 kilograms of cocaine at a time in Milwaukee. Hopson said he had people to help him and would kill the cocaine source if there were more than two kilograms present when they robbed him. Hopson stated that he had AK47 firearms with 100 round clips. Hopson and the UC agreed that the proceeds of the robbery would be evenly split between them. Hopson stated that he and a white male friend had recently done a home-invasion robbery in Memphis. Hopson referred to this individual as a "big white boy."

7. On past occasions, law enforcement officers doing surveillance of Hopson have observed him in the company of Victor R. Vilkoski, a white male with a date of birth of May 27, 1975. Milwaukee police records list Vilkoski as 6'2" tall and weighing

250 lbs. An NCIC check on Vilkoski reveals convictions for possession of controlled substances with intent to distribute in 1993, fleeing an officer in 1994 and 1995, and armed robbery in 1996.

8. On January 20, 2009, Hopson told UC that he had beat a murder case about six months before. NCIC records reflect that Hopson was arrested for first degree intentional homicide in Milwaukee in March of 2008 but was not prosecuted.

9. On January 21, 2009, UC met Hopson at Midwest Customs. They discussed carrying out the robbery of UC's drug source during the following week. When asked if he would be ready, Hopson told UC that he and his partner "stay ready." Hopson said that he would "tear that boy's ass up."

10. On January 25, 2009, UC called Hopson at the number Hopson said he could be reached at to say that the UC would be in Milwaukee the next day and would call Hopson in the afternoon to get together.

11. At approximately 5:30 p.m. on January 26, 2009, UC called Hopson to arrange to meet him at Michael's Restaurant at 22nd and Wisconsin Avenue in Milwaukee at approximately 6:30 p.m.

12. At approximately 6:36 p.m. on January 26, 2009, UC arrived at Michael's Restaurant and called Hopson who said he could not come there because he was working on a car at Midwest Customs.

3

13. At approximately 7:46 p.m. on January 26, 2009, UC arrived at Midwest Customs. In addition to wearing a device to record and transmit audio of the meeting, UC also wore a video camera to make a video recording of the meeting. I have reviewed that video. Hopson was present at Midwest Customs working on a car. UC and Hopson went into a bathroom to talk. UC said he ordered five kilograms from his source named Moe, who would deliver them to UC on January 28, 2009. UC said he wanted to meet whoever Hopson was bringing on the robbery to make sure they all agreed on the plan. Hopson said that his "guy" was ready to go. Hopson suggested that they rob Moe after he delivered five kilograms to UC. They would shoot at Moe, "bust at them," and "try to kill their ass." Hopson said they should also bloody UC so he looked like a victim. Hopson suggested that perhaps they should appear to kidnap UC at the time of the robbery. UC said that Moe would have 8 to 9 kilograms with him and Hopson and his partner were guaranteed to get at least five kilograms. UC said that Hopson could back out but Hopson repeatedly said that he wanted to do it. Hopson noted all of the guns that he had and said he would "kill that nigger."

14. On January 28, 2009, at approximately 2:48 p.m., UC called Hopson. The UC stated that they had to be ready because his "guy" would be coming with 14 "keys" or 14 "bricks." Hopson agreed that he would be ready.

15. On January 28, 2009, at approximately 3:52 p.m., UC called Hopson again. He stated that his deal with his guy was still on and would be expected to occur in the

4

range of 6:30 to 7:00 p.m. He told Hopson to be sure he was ready. Hopson stated that he was ready.

16. Hopson and UC agreed to meet at a predetermined location in Milwaukee and did meet there shortly after 7:00 p.m. on January 28, 2009. UC was waiting when three vehicles arrived together, containing eight men. One vehicle was a Ford Taurus with Wisconsin License Plate No. 987-FDE. It was driven by Hopson and Xavier Turner (DOB: 12/31/76) was a passenger. That license plate is registered to a Janus Schmidt of 8627 West Burleigh, Wauwatosa, Wisconsin. The second vehicle was a Pontiac Torrent with Wisconsin License Plate No. BRORAPP. That vehicle was driven by John Gilliam (DOB: 5/18/89) and Blake Wilson (DOB: 9/16/85) was a passenger. The third vehicle was a Lexus with Wisconsin License Plate No. 186-HRY. That vehicle is registered to Karen Harris of 5464 North Port Washington Road, Glendale, Wisconsin. Brandon Bean (DOB: 1/13/88) was driving that vehicle. Its passengers included DeShaun Baldwin (DOB: 1/23/77), Travis Raddle (DOB: 12/1/85), and James Ware (DOB: 1/20/90). Addressing the whole group, UC asked if all of them were all set. He stated that he wanted everyone there to know what he looked like because he did not want anyone to make a mistake and think that he was the object of the robbery. He asked Hopson if everyone knew what they were doing. Hopson stated that they did. Hopson instructed the other seven men to get out of their vehicles and take a look at UC so they would know who he was. UC stated that this involved 14 "keys" of cocaine and asked if everyone was

5

straight on that. Hopson stated that UC was not the one they were hitting and "we ain't gonna rip him." UC has told me that he made a point of coming up to each of the eight men present.

17. After this meeting, UC drove his vehicle, followed by the other three vehicles, to a predetermined location where UC had told Hopson he had a rental car for Hopson to use in the robbery. At that location, the eight men were arrested.

18. Two handguns, a Glock and a Taurus, were found in the Lexus. One Steyr 40 caliber handgun was found in the Pontiac.